# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-03161-14-CR-S-RK |
| | ) | |
| SOLOMON HODGES, | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT & RECOMMENDATION**

Before the Court is the Motion to Suppress filed by Defendant Solomon Hodges. (Doc. 275.) This action has been referred to the undersigned for the purpose of submitting a report on any pretrial motions to suppress evidence. On June 5, 2020, the undersigned held an evidentiary hearing. Defendant appeared in person with his attorney, John F. Appelquist, and the Government was represented by Byron Black. As follows, it is **RECOMMENDED** that the Motion to Suppress be **DENIED**.

I.  **Background**

At issue are Counts 18 through 21 of the Superseding Indictment (doc. 195) charging Defendant as follows: Count 18, possession with the intent to distribute fentanyl within 1,000 feet of a public or private elementary, vocational, or secondary school in violation of 21 U.S.C. § 841(a)(1) and 860(a); Count 19, possession with the intent to distribute fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); Count 20, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A); and, Count 21, possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Defendant moves to suppress, "any and all physical evidence seized incident to a warrantless search of a hotel room occupied by

Defendant on or about June 4, 2019 … and any and all other or further evidence derived therefrom." (Doc. 275 at 1.) According to Defendant, neither he nor his guests gave valid consent, and, if valid consent was given, the ensuing search exceeded the scope of said consent.

II. **Findings of Fact**

On June 4, 2019, Defendant occupied Room 217 of the Baymont Inn, located at 1610 East Evergreen Street in Springfield, Missouri. (Doc. 293 at 8, 112.) Defendant had been staying at the hotel for one week and had stayed there "a couple" times before. (*Id.* at 112, 132.) Because the hotel would not rent rooms to Springfield residents, Defendant's friend, Chynna Wright, rented Room 217 and he paid for it. (*Id.* at 112, 133.) Room 217, on the date at issue, was Defendant's "temporary home." (*Id.* at 134.)

On the morning of June 4, 2019, Officer Damiun Walker of the Springfield Police Department received a call for service at the Baymont Inn. (*Id.* at 8, 27.) Between 5:00 and 5:30 a.m., Officer Walker arrived at the hotel and met with the front desk clerk, who told him about several rooms with a high number of persons going in and out at late hours. (*Id.* at 9.) According to Officer Walker, based on his training, unusually high traffic at a motel late at night is "because of drug-related things." (*Id.* at 36.)

Officer Walker then called Officer Steve Miller, who had more experience in general drug investigations. (*Id.* at 9-10, 28.) When Officer Miller arrived, the two officers learned from the front desk clerk that Room 217 was one of the rooms with high traffic. (*Id.*) They also learned that Room 217 was rented to a Chynna White (or Wright) but paid for by a Black male with the last name of "Hodges." (*Id.* at 43-44, 132.) "China White" is a slang term for heroin. (*Id*. at 58.) This information, paired with the reported high traffic, led Officer Miller to also suspect there was drug activity occurring in Room 217. (*Id.* at 45-46.)

2

At about 6:00 a.m., the two officers went to Room 217. (*Id.* at 10, 47.) Prior to knocking on the door, Officer Miller began to smell freshly burnt marijuana in the hallway outside the room. (*Id.* at 47.) Officer Miller covered Room 217's peephole with his finger for safety reasons and knocked on the door. (*Id.* at 47-49, 84.) Defendant walked to the door and, without opening it, asked "Who is it?" multiple times. (*Id.* at 116.) Officer Miller identified himself as Springfield Police. (*Id.* at 11, 47.) Defendant did not hear Officer Miller identify himself. (*Id.* at 116.) When Defendant looked through the peephole, he could not see anything. (*Id.*) At least thirty seconds after the first knock, Defendant opened the door. (*Id.* at 11, 116.) As the door opened, the odor of marijuana in the hallway became stronger and Officer Miller concluded the odor was coming from Room 217. (*Id.* at 57, 87.)

After opening the door, Defendant stood inside the doorway while the officers remained just outside the door, in the hallway. (*Id.* at 117.) The officers told Defendant there was a vehicle with a dog in it in the hotel parking lot and they were going room to room at the Baymont Inn looking for the owner. (*Id.*) Such a "ruse" was often used in scenarios such as this to initiate communication with suspects and had been used by Officer Miller before. (*Id.* at 32, 56.) Defendant believed the dog story was "bogus." (*Id.* at 132.) Officer Miller then told Defendant that he smelled marijuana coming from Room 217. (*Id.* at 59, 117, 131.) Defendant admitted he had consumed marijuana prior to the encounter and still had "half a blunt" in his pocket. (*Id.* at 131.) Officer Miller did not notice any indicia of impairment by drugs or alcohol in Defendant: his speech was not slurred, he had clarity of mind and his responses were reasonable and appropriate. (*Id.* at 73-74.) Officer Miller then asked Defendant if they could come inside. (*Id.* at 52.) Defendant replied "yes," and stepped aside to allow the two officers to enter the room. (*Id.* at 13, 52.) Officer Miller took the lead role in the ensuing investigation. (*Id.*)

3

The officers observed two women, Ms. Johnson and Ms. Green, in the room with Defendant and obtained identification from both of them. (*Id*. at 13, 18, 54). Officer Walker engaged the two women in "small talk" while Officer Miller spoke with Defendant. (*Id.* at 13, 18.) Officer Miller asked Defendant who had rented the room. (*Id.* at 58.) After some hesitation, Defendant responded, "Chynna White." (*Id*.) As "China White" is a slang term for heroin, this strengthened Officer Miller's suspicion that drug activity was occurring in Room 217. (*Id.* at 58-59.) Officer Miller again told the them he could smell marijuana and asked Defendant and his guests if there was anything illegal in the room. (*Id.* at 59). Defendant and the two women responded "no." (*Id.*) Around the same time, Officer Miller observed clear plastic baggies and digital scales, often used in drug activity, sitting on a counter in the room. (*Id.* at 60.)

Officer Miller then asked Defendant if he could search his person. (*Id.* at 61.) Defendant responded "yes," turned around, and placed his hands in the air. (*Id*. at 61, 90.) Officer Miller searched Defendant and found a burnt marijuana cigarette and a clear sandwich baggie containing heroin and fentanyl. (*Id.* at 62, 119.) This contraband was seized by Officer Miller, who then allowed Defendant to take a seat. (*Id.* at 64.) Officer Miller asked if there were any other illegal items in the room. (*Id*. at 64, 119.) Defendant and the two women said there was nothing else illegal present, although the two women identified a few syringes located in various spots around the room. (*Id.*)

Officer Miller then asked Defendant and the two women for permission to search the room. (*Id.* at 64-65, 94-95.) The two women said, "yes." (*Id.* at 64-65.) Defendant also said, "yes." (*Id.* at 65, 121.) Officer Miller did not tell Defendant and the two women they could refuse or revoke consent. (*Id.* at 95.) Neither Defendant nor the two women ever expressed any limitation on the search, nor did they ever revoke their consent. (*Id.* at 65-66.)

4

Officer Walker did not participate in the search of the hotel room and largely played a backup role during the encounter. (*Id.*) He talked with the two women and watched Defendant while Officer Miller searched. (*Id.* at 20, 25.) The officers wanted Defendant to remain seated, to ensure Officer Miller's safety while he searched the room. (*Id.* at 35, 37.) Officer Miller would not have stopped Defendant from leaving the room, because he knew his identity and had seized the contraband found on his person. (*Id.* at 64.)

In addition to the baggies and the scale, Officer Miller found marijuana in a cup on the desk, two pipes in a bedside table, and "a lot of men's clothing," "ten plus pairs of shoes" and a red nylon duffel bag in the closet. (*Id.* at 66-67.) Defendant identified the duffel bag as his own. (*Id.* at 68, 123.) Officer Miller found mail addressed to Defendant in zippered side pockets of the duffel bag. (*Id.* at 67.) Because the main compartment of the duffel bag had a padlock on it, Officer Miller asked Defendant if there was a key, which Defendant denied, then asked for permission to cut the duffel bag open. (*Id.* at 68, 99, 123.) Defendant replied, "I guess, go ahead." (*Id.* at 99.) Officer Miller cut the duffel bag open with a knife and found another baggie of heroin and fentanyl and a KelTec .380 pistol with two rounds in the magazine. (*Id.* at 69.) When asked if his DNA would be on the pistol, Defendant replied, "yes." (*Id.* at 70.) When asked if his fingerprints would be on the baggie of heroin, Defendant shook his head in a "yes fashion." (*Id.*) Officer Miller seized all contraband, including Defendant's cell phone, and allowed Defendant and the two women to remain in the room. (*Id.* at 71, 125.) No one was arrested. (*Id.* at 71.)

Officer Miller offered Defendant an "opportunity to […] help himself out" and asked him if he would be willing to cooperate with law enforcement further. (*Id.* at 34, 72, 101.) Defendant communicated a willingness to voluntarily cooperate with law enforcement. (*Id.* at 72.) Officer Miller, Officer Walker and Defendant left Room 217 and made their way to the hotel's parking

lot, where they continued to talk for another ten to fifteen minutes. (*Id.* at 72, 124.) About an hour passed from the first knock on Room 217 to the time Defendant and Officer Miller exited to the parking lot. (*Id.* at 39.)

In the parking lot, Defendant gave his contact information (specifically, his mother's home phone number at his permanent residence) to Officer Miller. (*Id.* at 73, 125.) Officer Miller told Defendant that other agents would follow up in the coming days. (*Id*.) Officer Miller and Officer Walker left the hotel at around 7:15 a.m. (*Id.* at 75.)

During the encounter, neither of the two uniformed officers brandished any of their weapons or called any other officers to the scene. (*Id.* at 14, 138.) At no time during the encounter was Defendant threatened, told he was under arrest, placed in handcuffs, physically restrained, or *Mirandized*. (*Id.* at 22, 24, 26, 138.) Defendant had been convicted on drug charges at least four times before, in both state and federal courts. (*Id.* at 141-149.) Furthermore, Defendant has encountered law enforcement or has been arrested at least twelve other times. (Doc. 215 at 4-6.) Defendant is familiar with the *Miranda* warning and rights afforded to him. (*Id.* at 141.) Neither officer noted any signs of impairment or intoxication in Defendant. (*Id.* at 21-22, 73.) Defendant had used marijuana sometime prior to the encounter, but he understood what the officers were saying. (*Id.* at 129-130, 139-140.) Defendant was 59 years old on the date at issue and graduated from high school. (*Id.* at 128.) Neither Defendant, nor his two guests, ever asked the officers to leave the room. (*Id.* at 61.) Defendant was "extremely cooperative" throughout the encounter. (*Id*. at 61.)

### III. Conclusions of Law

The Fourth Amendment sets forth an individual's right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …." U.S. Const. amend.

IV. Additionally, a search warrant must be issued upon probable cause before a search or seizure is executed. *Id*. A search or seizure conducted without a warrant is *per se* unreasonable, and therefore illegal, unless a valid exception to the warrant requirement applies. *United States v. Mendoza*, 677 F.3d 822, 829 (8th Cir. 2012).

A search conducted with consent is a well-established exception to the general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Simply put, it is reasonable for the police to conduct a warrantless search once they have been permitted to do so by a suspect. *Id.* at 219. When valid consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises, a warrantless search is not *per se* unreasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). For consent to be valid it must be voluntarily given. *United States v. Escobar*, 389 F.3d 781, 784 (8th Cir. 2004). Consent is voluntarily given "if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990). When determining if consent was voluntarily given, one must examine the "totality of the circumstances" in the case at hand, considering characteristics of the defendant and the environment surrounding the search. *Id.* It is the government's burden to prove, by a preponderance of the evidence, that consent was voluntarily given. *United States v. Czeck*, 105 F.3d 1235, 1239 (8th Cir. 1997). In addition, consent "may be inferred from the defendant's 'words, gestures, or other conduct.'" *United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016) (*citing United States v. Pena–Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)).

Furthermore, under the Fourth Amendment, a search must fall within the scope of the consent given. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The standard for measuring the scope of consent given is that of objective reasonableness, or, "what would the typical person have

understood by the exchange between the officer and the suspect?" *Id.* Such a determination must also be made by examining the totality of the circumstances, which includes the language of a person's consent and their actions during the search. *United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009).

It is well settled that these protections "apply with equal force to a properly rented hotel room during the rental period" as they do to a home. *United States v. Rambo*, 789 F.2d 1289, 1295 (8th Cir. 1986); *see also Hoffa v. United States*, 385 U.S. 293, 301 (1966) (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)). In addition, consent may be given by anyone who has common authority over, or a sufficient relationship to, the premises to be searched. *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006). An officer must reasonably believe that, under the totality of the circumstances, someone has the common authority to consent. *Id*. at 668.

    a. **Validity of Defendant's Consent**

Defendant claims he never gave valid consent to the officers on the morning of June 4, 2019. The Government counters that Defendant validly consented three times: when Officer Miller asked to enter the room; when Officer Miller asked to search Defendant's person; and, when Officer Miller asked to search the room. As the totality of the circumstances changed only slightly between each alleged instance of consent, the undersigned will first analyze the personal characteristics of Defendant and the environment in the hotel room during the morning in question.

Valid consent is "the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." *Chaidez*, 906 F.2d at 380. When determining if consent was voluntarily given, one must examine the "totality of the circumstances" in the case at hand. *Id.* Personal characteristics to be considered include: (1) the defendant's age and mental ability; (2) whether the defendant was intoxicated or under the influence of drugs; (3)

8

whether the defendant was informed of their *Miranda* rights; and, (4) whether the defendant was aware, through prior experience, of the protections that the legal system provides for suspected criminals. *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009). It is also important to consider the environment in which consent was given, including: (1) the length of the questioning; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and, (6) whether the individual objected to the search or stood by silently. *Id.* No single factor is dispositive or controlling and they should not be applied mechanically. *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000). These enumerated factors are also non-exhaustive, and courts may consider factors not listed. *United States v. Quintero*, 648 F.3d 660 (8th Cir. 2011).

  Considering both the personal characteristics of Defendant and the environment in the hotel room, the undersigned concludes that Defendant consented voluntarily and not as a result of duress or coercion. The first personal factor to consider is the defendant's age and mental ability. The Eighth Circuit has held that persons as young as 29, and as old as 57, can provide voluntary consent to a search. *United States v. Correa*, 641 F.3d 961, 967 (8th Cir. 2011); *United States v. Larson*, 978 F.2d 1021, 1024 (8th Cir. 1992). Additionally, some high school education can support the validity of a defendant's consent. *See United States v. Becker*, 333 F.3d 858, 861 (8th Cir. 2003). Here, Defendant was 59 years old at the time of the incident and is a high school graduate. His age and education support the conclusion that he understood the officer's requests and responded appropriately and that his consents were freely and knowingly given.

Second, the influence of drugs or alcohol can inhibit a defendant's ability to give valid consent. However, "the mere fact that one has taken drugs […] does not render consent involuntary." *Rambo*, 789 F.2d at 1297. Although Defendant had used marijuana and possibly heroin sometime prior to the encounter, he stated that he understood the officers' requests. Furthermore, neither officer noticed any signs of impairment in Defendant. Accordingly, the undersigned finds that Defendant was neither intoxicated nor under the influence of drugs so as to render his consent involuntary.

Third, *Miranda* warnings, i.e., the advisement of a defendant's rights, "can lessen the probability that a defendant was subtly coerced" into consenting. *United States v. Lee*, 356 F.3d 831, 834 (8th Cir. 2003). However, *Miranda* warnings are not required for consent to be voluntary. *Id.* Here, Defendant was never *Mirandized* by the officers, nor was his right to revoke his consent communicated to him. Therefore, this factor cuts against the voluntariness of his consent. However, in light of Defendant's extensive prior experience with law enforcement, as follows, this factor carries little weight.

The final personal characteristic to be considered when determining the validity of given consent is the awareness of the defendant of protections afforded to them by the legal system. *See Laing v. United States*, 891 F.2d 683, 686 (8th Cir. 1989); *United States v. Carter*, 884 F.2d 368, 375 (8th Cir. 1989). In *Carter*, the defendant was inexperienced with the criminal justice system and had never been interrogated by law enforcement officers. 884 F.2d at 375. This factor, among others, led the Eighth Circuit to affirm the suppression of the defendant's statements, as consent was involuntarily. *Id.* In the instant case, Defendant has been convicted of drug charges at least four times previously, in both state and federal court. And, he has encountered law enforcement or been arrested at least twelve times. Consequently, Defendant is familiar with his rights, including

his *Miranda* rights. His experience with the criminal justice system and awareness of the protections afforded to him support the conclusion that his consent was given voluntarily, despite his not being *Mirandized* on the morning in question.

Regarding the environment in which consent was given, the first factor to be considered is the amount of time the defendant was questioned. The Eighth Circuit has held that thirty-eight minutes, or "such a short time," in police custody did not render a suspect's consent involuntary, in light of the totality of circumstances. *United States v. Golinveaux*, 611 F.3d 956 (8th Cir. 2010). Here, Defendant allowed the officers to enter the hotel room, consented to a search of his person and consented to a search of the hotel room all within thirty minutes of first encountering the officers. Accordingly, the relatively short time that Defendant spent with the officers was not enough to overcome his will, and weighs in favor of concluding that his consent was voluntary.

Second, consent can be involuntary if the defendant was threatened, physically intimidated, or punished by police. *Chaidez*, 906 F.2d at 381; *see also Reck v. Pate*, 367 U.S. 433 (1961). In this matter, there is no evidence Defendant was ever threatened, physically intimidated, or punished by the police in any way, even after illegal contraband was seized. Neither officer ever removed their weapons, raised their voices, or physically touched Defendant apart from a consensual search of his person. This factor also supports the voluntariness of Defendant's consent.

Third, a finding of involuntary consent is supported where police made promises or misrepresentations upon which the defendant relied. *Chaidez*, 906 F.2d at 381; *see also United States v. Turpin*, 707 F.2d 332, 334 (8th Cir. 1983). Here, Defendant cites to *United States v. Quintero*, wherein the Eighth Circuit affirmed suppression of evidence where officers embellished evidence against a defendant to intentionally mislead two suspects into consenting to a search of his hotel room. 648 F.3d 660, 664 (8th Cir. 2011). No such reliance nor misrepresentation of such

11

magnitude exists here. Officer Miller did not claim to have any evidence against Defendant. Although Officer Miller initially used a ruse to open communications, he quickly dropped this line of conversation and pivoted to discussing the smell of marijuana with Defendant. Also, Defendant in no way relied on the officers' initial claim that they were looking for the owner of a vehicle with a dog locked inside, as he believed it to be "bogus" and "bullshit." (Doc. 293 at 130.)

Fourth, consent may be involuntary if the defendant is under arrest or in custody at the time consent is given. *Chaidez*, 906 F.2d at 381. When a suspect is in custody, there is often a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). The Eighth Circuit has held that "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody ... is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990) (internal quotation omitted).

The Eighth Circuit in *Griffin* also lists certain "coercive factors," the presence of which mitigate or aggravate the existence of custody: (1) whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest; (2) "whether the suspect possessed unrestrained freedom of movement during questioning;" (3) whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities; (4) "whether strong arm tactics or deceptive stratagems were employed during questioning;" (5) whether there was a police-dominated atmosphere; and (6) "whether the suspect was placed under arrest at the termination of the questioning." *Id.*; *see also United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004).

12

In the instant case, Defendant was never informed that his participation in the officers' investigation was voluntary, that he could leave, or that he was not under arrest. Defendant was also allowed to take a seat and watched by Officer Walker to ensure he remained sitting, although this was done to ensure Officer Miller's safety during the search of the room. Defendant voluntarily acquiesced to Officer Miller's questions, as he was "extremely cooperative." No strong-arm tactics were used by either officer. Defendant and the two women outnumbered the two officers, mitigating any police-dominated atmosphere. Finally, Defendant was not placed under arrest after questioning. Thus, after a consideration of the *Griffin* factors, the undersigned finds that Defendant was not in custody following the search of his person when he was allowed to take a seat in the hotel room.[1]

The fifth environmental factor to be considered when determining the validity of consent is whether the encounter occurs in a private or secluded location. *Chaidez*, 906 F.2d at 381. The probability of coercion is lessened if the interaction with law enforcement occurs in public. *Id.* However, this factor is not determinative. *Id.* In *United States v. Dunning*, the suspect consented to a search by law enforcement in a private cabin instead of a public location. 666 F.3d 1158, 1165 (8th Cir. 2012). Nevertheless, the Eighth Circuit found the fact non-determinative on its own and ruled the suspect gave valid consent after a consideration of all other factors. *Id.* In the instant case,

---

[1] Defendant cites the case of *Florida v. Royer* for the proposition that "[c]onsent obtained during an unlawful detention is not valid." 460 U.S. 491 (1980). Although the undersigned concludes that Defendant was neither detained nor in custody, assuming, arguendo, he was, the detainment was lawful pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, certain seizures to investigate possibly criminal behavior are justified under the Fourth Amendment where the officer possesses reasonable articulable suspicion that "criminal activity may be afoot." *Id*. at 30. Here, the information known to the officers at the time, i.e. the high foot traffic at Room 217, the name "China White," which is slang for heroin, under which the room was registered, the odor of marijuana in the hallway outside Room 217, which grew stronger when the door to Room 217 was opened, and Defendant's admission to possession of marijuana, supports their reasonable suspicion to briefly detain Defendant for further investigation. *See United States v. Miller*, 104 F. App'x 591, 595 (8th Cir. 2004). Accordingly, any contention that the consent was invalid because the detention was unlawful fails.

the encounter took place in a private hotel room. This factor weighs against the voluntariness of Defendant's consent, although to a lesser extent, as Defendant was not alone with the officers.

The sixth and final environmental factor is whether the individual stood by silently or objected to the search. *Chaidez*, 906 F.2d at 381. Here, Defendant stood by silently during the search, never asked the officers to leave the room nor made any objections to the search and was described as "extremely cooperative" by Officer Miller. (Doc. 293 at 61.) Accordingly, this factor supports the conclusion that Defendant's consent was voluntary.

As the aforementioned factors are non-exhaustive, a court may consider other factors it finds persuasive. *Quintero*, 648 F.3d at 667. Here, Defendant's voluntary cooperation with the officers following the events in the hotel room weighs against finding his consent was coerced. Defendant, of his own accord, followed the officers to the parking lot, where he willingly discussed cooperating and gave his contact information for future communication with law enforcement. Defendant's actions in the hotel room and the parking lot are not consistent with those of a suspect who was coerced or under duress.

In summary, based on the totality of the circumstances, both personal and environmental, the undersigned concludes that Defendant gave valid consent to the officers to enter the hotel room, search his person, and search the room. Although the officers never read Defendant his *Miranda* rights or told him he could revoke consent, Defendant had experience with the criminal justice system and was aware of his legal rights. The search occurred in a private space, but Defendant had two guests in the room, mitigating any potentially police dominated atmosphere. Finally, Defendant was not detained, much less unlawfully detained.

All other circumstances of the encounter support the conclusion of valid consent. Defendant was 59 years old at the time and is a high school graduate. He was not impaired by

14

Case 6:19-cr-03161-RK    Document 317    Filed 08/12/20    Page 14 of 20

drugs or alcohol. He was aware of his legal protections from previous encounters with law enforcement. The length of the encounter was not unreasonable, and the officers never used threats, physical intimidation, or punishment to obtain his consent. Defendant did not detrimentally rely on the minor misrepresentation initially used by Officer Miller. Finally, he stood by silently during the search, without objection, and cooperated with law enforcement afterwards of his own accord. The totality of the circumstances establishes that Defendant voluntarily consented to the entry and searches, and as a result, the evidence should not be suppressed on this basis.

    b. **Third-Party Consent to Search**

Assuming that Defendant did not give valid consent to search the hotel room, the Government argues the search was still legal based on third-party consent given by the two women, Ms. Johnson and Ms. Green. This Court disagrees, as the two women could not properly consent to a search of Room 217. For consent given by a third party to be valid, the third party must have either actual or apparent authority to do so. *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). If the party giving consent lacks actual authority, the consent will still be valid if the officer reasonably believed that the party had apparent authority over the premises or effects. *United States v. Almeida-Perez*, 549 F.3d 1162, 1169-70 (8th Cir. 2008).

First, there is no evidence that either Ms. Johnson or Ms. Green had actual authority to consent to a search of the hotel room. As for any apparent authority of Ms. Johnson or Ms. Green, at the time Officer Miller asked for consent to search the hotel room, he had identified Defendant as the man that had paid for the room and knew that neither of the two women was "Chynna Wright," the woman who had rented the room. Officer Miller had also observed "a lot" of men's clothing and shoes around the room. (Doc. 293 at 67.) In light of these facts, it would be unreasonable to believe that either of the two women had apparent authority over the room.

15

Therefore, the Government's argument that the third-party consent of either Ms. Johnson or Ms. Green to search the hotel room was valid fails.

    c. **Scope of Defendant's Consent to Search**

Defendant claims that Officer Miller exceeded the scope of consent given when he cut open the locked duffel bag containing a firearm and drugs. A consent search is limited by the scope of the consent given. *United States v. Ware*, 890 F.2d 1008, 1011 (1989). Additionally, the scope of a warrantless search is generally defined by its expressed object. *United States v. Ross*, 456 U.S. 798 (1982). For example, a search for undocumented immigrants does not justify opening a suitcase. *Id.* at 824. Although *Ross* involved vehicle searches based on probable cause, the Court's ruling addresses searches of fixed premises in general and closed containers located within. *Id.* at 822-23. The Court in *Ross* stated:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. […] When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.
>
> This rule applies to all containers, as indeed we believe it must.

*Id.* (footnotes omitted).

There are distinctions between warrantless searches based on probable cause and warrantless searches based on consent. Regarding the scope of a consent search, we turn to *Florida v. Jimeno*. 500 U.S. 248 (1991). In *Jimeno*, an officer asked the driver of a stopped vehicle for permission to search the car. *Id.* The driver gave his consent to a general search of the car and did not limit the scope of the search. *Id.* The officer found a closed paper bag lying on the floor, opened it, and found cocaine. *Id.* at 250. The Supreme Court upheld the search, holding that the officer

16

could have reasonably believed that the driver's general consent included a search of the paper bag. *Id.* at 251. The Court held that the scope of a consensual search is determined by what a "typical reasonable person would have understood by the exchange between the officer and the suspect." *Id.* The Court cited *Ross* in determining that the scope of a consent search is generally defined by its express object. *Id.*

However, the Court in *Jimeno* was careful to note that although it was reasonable for the officer to conclude that a suspect's general consent authorized the search of a paper bag on the floor, it would very likely be unreasonable to conclude that it authorized the "breaking open of a locked briefcase within the trunk…" *Id.* at 252. Further, unlike a probable cause search, a consent search allows for a suspect to limit or restrict the search as he chooses. *Id.*

In this case, Defendant gave Officer Miller general consent to search Room 217 for drugs and other illegal paraphernalia. Thus, the scope of the search included objectively reasonable places in the hotel room where drugs could be located, but not locked containers. As a result, a search of Defendant's locked duffel bag would have exceeded the scope of the search, absent consent to expand the scope of the search. However, the undersigned concludes Officer Miller obtained Defendant's consent to expand the scope of the search.

The Government's burden of showing valid consent to expand the scope of a search cannot be discharged by showing a mere acquiescence to a claim of lawful authority. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968). "Rather, the government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making." *United States v. Cedano–Medina*, 366 F.3d 682, 684 (8th Cir. 2004) (internal citations and quotations omitted).

17

Language such as, "go ahead," can be ineffective in communicating consent to search in the Eighth Circuit. In *United States v. Escobar*, two suspects were questioned in a bus terminal regarding suspicious, locked luggage. 389 F.3d 781, 783 (8th Cir. 2004). The officers removed the suspects to a private location and failed to advise the suspects that they had a right to refuse consent. *Id.* Officers asked the suspects if they could search the locked bags. *Id.* Prior to this request, the investigating officers communicated to the suspects that they had probable cause to search the bags and that the suspects had no choice to permit it. *Id.* The two suspects each responded with, "go ahead," or, "go ahead, you're going to do it anyways." *Id.* The Eighth Circuit held that "simply telling a police officer to 'go ahead' with a search is not, in and of itself, proof of voluntary consent." *Id.* at 786.

On the other hand, "I guess" can communicate effective consent. In *United States v. $117,920.00 in U.S. Currency*, a suspect responded to an officer's request to search his vehicle by saying, "I guess if you want to." 413 F.3d 826, 827 (8th Cir. 2005). The court held that that the suspect's reply was "sufficient to cause a reasonable person to believe he had consented and was therefore not impermissibly equivocal or unspecific." *Id.* at 828.

Turning to the case at hand, Officer Miller asked Defendant if he could cut his locked duffel bag open to search it for contraband. According to Officer Miller, Defendant replied, "I guess, go ahead." Defendant claims his response was not so permissive. Upon review, the undersigned finds Officer Miller to be a more credible witness than Defendant and takes Officer Miller's assertions to be true.[2]

---

[2] Witness credibility is a task generally left to the hearing judge and, if not internally inconsistent, is rarely clear error. *See Anderson v. City of Bessemer City*, 470 U.S. 564 (1985); *see also United States v. Heath*, 58 F.3d 1271 (8th Cir. 1995).

Consequently, Defendant's reply of "I guess, go ahead," was sufficient to cause a reasonable person to believe Defendant had consented to the cutting open of his duffel bag. The instant facts contrast significantly to those in *Escobar*. Officer Miller did not tell Defendant he had no choice in the matter or that there was probable cause to cut open the duffel bag. Defendant's inclusion of "I guess" in his reply is more affirmative than the reply of only "go ahead" in *Escobar*. Officer Miller acted appropriately in obtaining Defendant's consent before searching the locked duffel bag and it was reasonable to believe that Defendant gave valid consent to cut the duffel bag open. Accordingly, the scope of the search of the hotel room, including the locked duffel bag therein, did not exceed the scope of the consent given, and the motion to suppress necessarily fails here.

### d. Fruit of the Poisonous Tree

Defendant also contends that as a direct result of a warrantless search of the hotel room in violation of the Fourth Amendment, "any and all other or further evidence derived therefrom" or "fruits" should be suppressed as well. (Doc. 275 at 1, 5.) Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). As discussed, the search of the hotel room was premised on the valid consent of Defendant and did not exceed the scope of said consent and was therefore lawful. As a result, Defendant's fruit of the poisonous tree argument fails.

## IV. Recommendation

Defendant has challenged the constitutionality of the search of his person, hotel room, and locked duffel bag on June 4, 2019. In responding to Defendant's motion to suppress evidence gathered from that search, the Government has shown, by a preponderance of the evidence, that

19

Defendant gave valid consent to the search of his person and hotel room by Officer Miller. Additionally, the scope of the search was properly expanded by Defendant's valid consent, allowing Officer Miller to cut open the locked duffel bag. As a result, evidence gathered from the search should not be suppressed. Therefore, it is **RECOMMENDED** that Defendant's Motion to Suppress be **DENIED**.

/s/ David P. Rush
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE: August 12, 2020